UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Criminal No. 5:18-cr-00106-GFVT-MAS |
| V. | ) ) | **MEMORANDUM OPINION** |
| GERALD G. LUNDERGAN and DALE C. EMMONS, | ) ) ) ) | |
| Defendants. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on the Defendants' Motion to Strike Improper Prosecutorial Commentary and for a Curative Instruction. [R. 232.] The Court denied this motion from the bench, and what follows is the Court's detailed articulations as to why the motion was denied. The United States called a witness to testify on a Friday during trial, asking foundational questions regarding a potential prior inconsistent statement made by the witness during an FBI interview. Testimony of that witness was set to continue on Monday. [R. 229 at 172.] The Defendants objected to the cumulative nature of the questioning but did not raise further objections. However, after a weekend recess and in the early morning hours before Court reconvened on Monday to continue with the witness's testimony, the Defendants requested the Court strike the Government's questioning as a violation of the Sixth Amendment and as improper vouching. [R. 232.]

I

On Friday, August 23, 2019, the United States called Elmer Joseph "Joey" George, Jr., as a witness in their case in chief. [R. 229 at 65.] Mr. George had worked with Defendant Dale

Emmons beginning in July 2013. *Id.* at 67. During the direct examination, the following exchange took place:

> [GOVERNMENT]: If we could publish what's been admitted as Government Exhibit 4C.
> BY [THE GOVERNMENT]: Q. Is this, to your knowledge, the first check you got for salary from Emmons and Company?
> A. Yes, ma'am.
> Q. And what's the date of it?
> A. September 11th, 2013.
> Q. Does it reflect that $3,500?
> A. Yes, ma'am.
> [GOVERNMENT]: If we could look at what's been admitted as Government Exhibit 5C.
> BY [THE GOVERNMENT]: Q. What's the date on this check, Mr. George?
> A. October 14th, 2013.
> Q. Is that another monthly check for $3,500?
> A. Yes, ma'am.
> Q. And did you understand that to be your salary?
> A. Yes, ma'am.
> [GOVERNMENT]: And the last one, if we could look at Government Exhibit 6B.
> BY [THE GOVERNMENT]: Q. Is this the third check you received from Emmons and Company for your monthly salary?
> A. Yes, ma'am.
> Q. And what's the date on this one?
> A. November 15th, 2013.
> Q. Another $3,500?
> A. Yes, ma'am.
> Q. What were these $3,500 monthly salary checks for?
> A. I was helping Mr. Emmons, as well as Alison's campaign, and we were trying to work to get the coordinated campaign effort started. But since the entity or entities was not yet in existence, I was assisting through helping Mr. Emmons.
> Q. Were these monthly salary checks for your work on the Alison Lundergan Grimes Senate campaign?
> A. They were helping with that as well as we were trying to get the coordinated campaign going as well.
> Q. Right. But were these checks for your work on the Alison Lundergan Grimes Senate campaign?

*Id.* at 80–83. At this point, counsel for Mr. Lundergan objected and counsel for Mr. Emmons joined that objection, arguing that the United States was leading the witness, that the question had been asked and answered, and suggested that the Government was badgering the witness.

*Id*. at 83. At the bench conference to address the objection, the Government revealed that these questions were to determine whether Mr. George had made a prior inconsistent statement. *Id*. According to the Government, when law enforcement interviewed Mr. George, he told them that the checks were for work on the Alison Lundergan Grimes Senate Campaign. *Id*. The objections were overruled and the questioning continued:

> Q. So Mr. George, were these checks for your work on the Alison Lundergan Grimes campaign?
> A. I did work that helped the Alison Lundergan Grimes campaign, but there were other things that I was performing as well. I believe Mr. Emmons was also assisting with Rita Smart's race and possibly some other judicial races at the time.
> Q. Is it your testimony here today that these checks were not just for your work on the Alison Lundergan Grimes campaign?
> A. Probably mostly for work that was done, you know, to help that campaign; but I can't say with certainty it was all for that work.
> Q. Was there a time closer to these events that you did have certainty that these were for your work on the Alison Lundergan Grimes campaign?
> A. Can you repeat that, please?
> Q. Was there a time closer to 2013 when you had more certainty as to what these checks were for?
> A. So I just want to make sure I'm understanding the question. If I knew specifically at this time what the work was for or shortly thereafter what the work was for?
> Q. I understood you just said you can't be certain that these were for your checks -- for your work on the Alison Lundergan Grimes campaign. Is that what you just said?
> A. Yes, ma'am.
> Q. Okay. Do you recall being interviewed by the FBI in this investigation?
> A. I do.
> Q. And was that back in October 2017?
> A. I believe that was -- that was the time, yes.
> Q. And was October 2017 closer in time to the election?
> A. Yes, ma'am.
> Q. Did that interview take place with Special Agent Ken Kirk; do you recall?
> A. Yes, ma'am.
> Q. And did that take place in your dad's office?
> A. It did.
> Q. And your dad, I think you testified earlier, is a lawyer, right?
> A. Yes, ma'am.
> Q. Was he present?
> A. He was.
> Q. Was Mr. Lundergan present for that interview?
> A. He was not.

> Q. Was Mr. Emmons present for that interview?
> A. He was not.
> Q. Did you tell Special Agent Kirk that these 3,500 monthly salary checks from Emmons and Company were for your work on the Alison Lundergan Grimes Senate campaign?
> A. I don't recall specifically wording it that way during that interview.
> Q. You don't recall saying that?
> A. Not specifically just for that work. I mean, that was almost two years ago. I'm not exactly certain how I phrased it at that time.
> Q. But you did get a $3,500 monthly check from Emmons and Company in that time frame?
> A. Yes, ma'am.
> Q. And your testimony here today is that it was for this campaign, but it was also for some other work?
> A. I can't specifically recall. I believe in my grand jury testimony, I stated that there were other elections at that time that I thought. So I couldn't remember specifically that it was 100 percent for that work.
> Q. But in your first interview with law enforcement, do you recall saying that's what it was for?

*Id*. at 84–87. Now counsel for Mr. Emmons objected, again for the cumulative nature of the questioning. *Id*. at 87. Again, the objection was overruled and the Government continued:

> Q. Mr. George, I think I just asked you, do you recall making that statement to Special Agent Kirk?
> A. I don't, but if that's the statement I told Agent Kirk, then that's what I said.

*Id*. at 87–89. No further objections were made by the Defendants. *Id*. However, the Defendants now argue that this line of questioning was improper for several reasons.

## II

Defendants first argue that the Government's "insinuation that Lundergan's and Emmons's presence in the courtroom caused a witness to testify untruthfully directly infringes upon Defendants' Sixth Amendment rights to confront their accuser and prejudices their ability to receive a fair trial. [R. 232 at 3.] The United States Constitution provides an accused the right to be confronted with the witnesses against him in all criminal prosecutions. U.S. Const. amend. VI. Neither the Government nor the Court has sought exclusion of the Defendants from the

4

Courtroom. Instead, Defendants argue that the insinuation by the Government "that favorable testimony offered by Mr. George could not be trusted because Emmons and Lundergan were present in the courtroom," violates the Sixth Amendment. [R. 232 at 4.] But the Defendants have not provided any legal basis for this assertion. The Sixth Amendment provides the Defendants the right to be present at trial, but the Court can find no law suggesting that the right is infringed upon by inferences of a witness's bias when the Defendants have not actually been excluded from the Courtroom.

Next, Defendants argue that the Government's questioning constituted impermissible vouching. [R. 232 at 5.] "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). This can include specific comments, *see, e.g., United States v. Dandy*, 998 F.2d 1344, 1353 (6th Cir. 1993) (finding it improper for the prosecutor to make the statement, "But [the witness] is an honest man, he told the truth to the FBI and he told the truth to you"), or an implication that the prosecutor has special knowledge of facts not before the jury relevant to the witness's credibility or trustworthiness, *see, e.g., United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994) (finding it improper for the prosecutor to indicate during closing arguments that the witness would lose the benefit of his plea agreement if he falsely testified).

The Government is permitted, however, as are the Defendants, to attack the credibility of any witness called to testify. Fed. R. Evid. 607. A witness's credibility is always relevant. *United States v. Vandetti*, 63 F.2d 1144, 1149 (6th Cir. 1980); Fed. R. Evid. 608. One method of this impeachment is to offer a prior inconsistent statement: a statement previously given under

penalty of perjury which is inconsistent with the testimony given at trial. Fed. R. Evid. 801(d)(1)(A). Inconsistency is defined broadly, and includes testimony reflecting "limited and vague recall of events, equivocation, and claims of memory loss." *United States v. LaVictor*, 848 F.3d 428, 451 (6th Cir. 2017) (quoting *United States v. Mayberry*, 540 F.3d 506, 516 (6th Cir. 2008)). It is well established law that before counsel can introduce evidence of a prior inconsistent statement, counsel must first lay a foundation for that impeachment. *United States v. Beverly*, 369 F.3d 516, 542 (6th Cir. 2004); Fed. R. Evid. 613(b). Here, counsel for the Government asked Mr. George if he told the FBI that the checks were for work on the Alison Lundergan Grimes Campaign, and he indicated that he neither recalls what he told the FBI nor for what work the checks specifically paid him. [R. 229 at 84–87.] This line of questioning is proper as a foundation for impeachment.

The Defendants argue that because the FBI 302 report is inadmissible in this case,[1] there is no admissible evidence that would permit the jury to consider Mr. George's prior inconsistent statement. [R. 232 at 5.] They argue that because the Government was unable to introduce the 302 report as extrinsic evidence of a prior inconsistent statement, necessarily the Government's questions were improper vouching. *Id*. But the Government *does* have admissible evidence of the prior inconsistent statement: the testimony of Agent Ken Kirk, who the Government intends to call as a witness. [R. 229 at 136–37.]

---

[1] A 302 report is typically inadmissible as hearsay evidence, as those reports memorialize an "investigator's selections, interpretations, and interpolations," rather than the witness's verbatim statements. *See United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005) (quoting *United States v. Nathan*, 816 F.2d 230, 236 (6th Cir. 1987)). Unless a witness has expressly adopted or approved the agent's notes in a 302 report, the notes on the 302 cannot be considered "statements" of the witness. *See United States v. Dorman*, 108 F. App'x 228, 245 (6th Cir. 2004) (citing *Goldberg v. United States*, 425 U.S. 94, 107 (1976)). Both parties seem to agree that the 302 is not admissible for substantive evidence or as impeachment evidence in this instance. [R. 229 at 131–39.]

The leading nature of questions concerning a prior inconsistent statement does not constitute improper vouching. *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987) (finding that the Government's foundation questions for a witness were not improper when the Government planned to introduce a prior inconsistent statement of the witness through the later testimony of an FBI agent). The Government here did not indicate a personal belief as to Mr. George's credibility, instead asking the repeated questions in order to fully question Mr. George about his statement, providing him an opportunity to explain any inconsistencies, and provide the necessary foundation to later ask Agent Kirk about the interview. Questions about the circumstances under which the previous statement was given, in comparison to the circumstances under which Mr. George testified, namely, the presence of the Defendants, is relevant evidence for the jury to determine which of Mr. George's statements is true. If these questions concerning a prior inconsistent statement constitute improper vouching, "[I]t would be impossible for any witness to be questioned at any trial concerning an inconsistent statement made to a government agent." *Causey*, 834 F.2d at 1283.

### III

The Sixth Amendment, in part as relevant to this issue, guarantees the Defendants the right to be present during trial to confront witnesses, but this does not mean that the Government cannot elicit testimony suggesting that their presence contributed to a witness's change in story. Nor does laying a proper foundation for the prior inconsistent statement constitute prosecutorial vouching. The Government here has not made any statements or implications to express any belief as to whether Mr. George is honest or dishonest. Thus, as articulated from the bench, the Court also finds that a curative instruction is unnecessary at this juncture.

This the 28th day of August, 2019.

Gregory F. Van Tatenhove
United States District Judge