UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | Criminal No: 5:18-cr-00106-GFVT |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| GERALD G. LUNDERGAN and | ) | **&** |
| DALE C. EMMONS, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

At the close of the government's proof, Defendant Gerald G. Lundergan made an oral motion for judgment of acquittal. [R. 287.] Defendant Dale C. Emmons joined in Mr. Lundergan's arguments, as well as made his own additional arguments. *Id.* Both Defendants argued that no rational trier of fact could convict them of the charges listed in the indictment. When it was made, the Court deferred ruling on the motion and the defense proceeded with its case. Ultimately, the jury found Mr. Lundergan and Mr. Emmons guilty of all charges listed in the Indictment.

Since the jury verdict, the Defendants' Rule 29 motion has also been the subject of considerable briefing. Mr. Lundergan and Mr. Emmons filed a Joint Renewed Motion for a Judgment of Acquittal, or in the Alternative, Motion for a New Trial. [R. 310.] Those motions are now ripe for review. [R. 320; R. 323.] For the reasons that follow, Defendants' Motion for Judgment of Acquittal, or in the Alternative, for a New Trial, is **DENIED**.

**I**

Defendants Gerald G. Lundergan and Dale C. Emmons were indicted on August 31, 2018 with ten and six counts, respectively, of violations of federal campaign finance laws. [R. 1.] In Count One, the United States alleged that Mr. Lundergan and co-defendant Dale C. Emmons participated in a scheme to funnel hundreds of thousands of dollars in corporate funds into the 2014 United States Senate race. [R. 120-1 at 2.] Over the course of several days, the government presented evidence seeking to prove that Mr. Lundergan used S.R. Holding Company's corporate funds to pay for campaign consultants and vendors, and deliberately failed to seek reimbursement from the campaign. The government also contends that Mr. Emmons conspired with Mr. Lundergan to violate campaign finance laws by performing consulting services for the campaign as well as paying sub-vendors with money from his own company, and then seeking reimbursement from S.R. Holding instead of the Campaign, as well as hiding these transactions with monthly invoices to S.R. Holding Co. for "consulting services retainers." In so doing, the government alleges that the Defendants caused the campaign to unwittingly file false reports with the Federal Election Commission, and caused false statements to be made which impeded investigation of a matter within the jurisdiction of the United States. Ultimately, the jury convicted Mr. Lundergan and Mr. Emmons of all charges in the indictment. [R. 305.]

**II**

**A**

Rule 29 requires this Court to enter a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When considering a Rule 29 motion based on an alleged insufficiency of the evidence, the Court may not reweigh the

evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury. *See United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).  Instead, the Court views the evidence in the light most favorable to the government, and then it considers whether any rational trier of fact could find the elements of the counts of conviction beyond a reasonable doubt. *See, e.g.*, *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016); *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003).  "In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden." *Callahan*, 801 F.3d at 616 (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)).  Finally, the Court must decide the motion on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. Pro. 29(b).  The Court, therefore, only considers the evidence presented during the government's case-in-chief.

## 1

Before determining whether the evidence is sufficient to convict under any given law, one must understand the law.  The Federal Election Campaign Act (FECA) is complicated, and nobody disputes that.  But it is not as complicated as the Defense would have it seem.  In a way, the defendants treated much of their Rule 29 motion—both in oral argument and on brief—as a motion for reconsideration.  That is, counsel made several arguments regarding proper interpretation of the applicable law that have previously been considered, and rejected, by the Court.  For that reason, it seems necessary to clarify what the Court finds, as consistent with the jury instructions in this case, the law requires.

Under the FECA, the statute commonly referred to as the "corporate contribution ban," it is unlawful for a corporation "to make a contribution or expenditure in connection with any election to any political office[.]"  52 U.S.C. § 30118(a).  The corporate contribution ban goes on to define the terms "contribution" and "expenditure":

the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 301, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication[.]

52 U.S.C. § 31118(b)(2).  Turning to section 301, "contribution" is further defined as "any gift subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for federal office; *or* the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  52 U.S.C. § 30301(8)(A)(i)–(ii) (emphasis added).  The term "expenditure" is further defined as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and a written contract, promise or agreement to make an expenditure."  52 U.S.C. § 30101(9)(A)(i)–(ii).

The defendants argue that "no reasonable jury could find that the . . . transactions at issue amounted to contributions to the Campaign" because they are in fact expenditures, which require coordination with the campaign in order to be unlawful.  [R. 310-1 at 10.]  The Court has addressed this argument time and time again.  [R. 66; R. 193; R. 270.]  As this Court has already stated, the FEC guidance cited by the defendants does not compel reading a coordination requirement into the prohibition on direct, in-kind contributions, such as those at issue here.  [R. 270 at 3.]  The law treats expenditures and contributions differently, because expenditures carry a far lesser risk of *quid pro quo* corruption than contributions.  *Citizens United v. FEC*, 558 U.S. 310, 345 (2010).  To mitigate risks arising from expenditures, certain of them are treated as contributions.  The Supreme Court in *Buckley* drew a distinction between "independent expenditures"—which are voluntary expenses incurred by private citizens independent of a

candidates campaign committee— and "coordinated expenditures"—which involve knowledge by the campaign, direction from the campaign, or the provision of in-kind assistance to be resold as a fundraiser for the candidate or used in a campaign event. *Buckley v. Valeo*, 424 U.S. 1, 36–37 (1976).

The FECA makes it a felony to "knowingly and willfully commit[] a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure aggregating $25,000 or more during a calendar year."  52 U.S.C. § 30109(d)(1)(A)(i).  This is the statute under which the defendants are charged.  The defendants would have this Court read the statute so that only coordinated expenditures, which require coordination with the campaign, are unlawful.  However, the plain language of the statute prohibits contributions *and* expenditures in excess of $25,000.  Coordinated expenditures are not the only type of contribution.  Some contributions, as defined above, need not involve coordination with the campaign.

Next, when counsel for Mr. Lundergan made his oral Rule 29 motion before the Court, he reiterated a constitutional argument that has also been previously addressed.  [R. 66 at 18.]  Because Mr. Lundergan is the sole owner and operator of S.R. Holding Co., and the contributions were made to his daughter's campaign, the defense again argues these were "intrafamilial" contributions, a limitation on which would violate the First Amendment.  [R. 284 at 31.]  The Court has addressed this argument before and found no authority for Mr. Lundergan's proposition.  [*See* R. 66 at 17–18.]  As the *Buckley* Court recognized, the limits of individual contributions are not suspended for members of a candidate's family: "Although the risk of improper influence is somewhat diminished in this case of large contributions from immediate family members, we cannot say that the danger is sufficiently reduced to bar

5

Congress from subjecting family members to the same limitations as nonfamily contributors."

*Buckley v. Valeo*, 424 U.S. 1, 53 n. 59 (1976).  Mr. Lundergan argues that this Court is not bound

by that statement.  The Court disagrees.

**2**

Having established the foregoing, the Court turns to the defendants' argument that there

is insufficient evidence supporting their conviction under Count Two of the indictment.  Count

Two alleges the defendants caused unlawful corporate contributions to be made to the Alison for

Kentucky campaign.  [R. 1.]  The indictment details several overt acts totaling twenty-six distinct

transactions, but essentially, the government alleges three general "categories" of contribution.

First, the government alleges that S.R. Holding made payments to Mr. Emmons as compensation

for political consulting services provided by Mr. Emmons to the Alison for Kentucky campaign.

Second, the government alleges that S.R. Holding, instead of the campaign, reimbursed Mr.

Emmons for payments Mr. Emmons made to third-party vendors for goods and services provided

to the Alison for Kentucky campaign.  Third and finally, the government alleges that S.R.

Holding made payments directly to third-party vendors as compensation for goods and services

provided to the Alison for Kentucky campaign.

As previously stated, the Court has already determined that the government need not

prove coordination to establish a violation of § 30118.  The Court turns next to the remaining

defense arguments regarding insufficiency of the evidence.

**a**

Defendants argue that the expenses related to a kickoff event held at the Carrick House

failed to satisfy the legal definition of contributions.  [R. 310-1 at 21–23; R. 323 at 25–26.]  They

contend that "a campaign vendor does not make a contribution to a campaign when it delays

invoicing it for expenses so long as that practice is consistent with its ordinary course of business."  [R. 310-1 at 21–23.].  Because the government did not show that late invoices were inconsistent with S.R. Holding's usual practice, the defendants argue that no reasonable jury could convict.  *Id.*

At trial, the jury heard evidence that S.R. Holding procured and paid for audio-video production, lighting, staging, an LED video wall, and video streaming all associated with the kick-off event.  Although these expenses totaled upwards of $25,000, S.R Holding only sought reimbursement in the amount of $3,706.25.  [Gov. Ex. 51F; R. 215 at 95–104.].  The jury also heard evidence the Mr. Lundergan received a report of disbursements that were included on the campaign's FEC report.  [R. 215 at 95–104.]  And while defendants are correct that vendors can delay reimbursement in the normal course of business, they cannot act with the intent to never collect.  The jury heard testimony that it was only after Mr. Lundergan received a grand jury subpoena did he bill the campaign for the unreported kick-off expenses.  [R. 254 at 20–30.] From this, there is ample evidence for a reasonable jury to conclude that S.R. Holding made unlawful corporate contributions in connection with the kick-off event.

**b**

Next, the defendants argue that the government failed to prove the payments from S.R. Holding Co. to Mr. Emmons were corporate contributions under federal law.  [R. 310-1 at 22–24; R. 323 at 9–11.]  The defendants' argument is twofold: first, they contend there is no proof of coordination with the campaign.  As already explained, *supra* II.A.1, coordination is simply not a requirement where the contribution at issue is "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  52 U.S.C. § 30301(8)(A)(ii).  Second, the defendants argue that the

government did not prove that Mr. Emmons's work was done for the benefit of the campaign. [R. 310-1 at 15.]  Instead, defendants contend that Mr. Emmons was effectively auditioning for an eventual position within the coordinated campaign, and any benefit to the Alison for Kentucky campaign was incidental.  *Id.*  However, there is similarly no such requirement that the payments be made for the benefit of the campaign.

The evidence presented was that Mr. Emmons billed Mr. Lundergan monthly for a "consulting services retainer," each time seeking around $20,000.  [R. 274 at 23–26.]  S.R. Holding paid out to Mr. Emmons, who then used these funds to pay Mr. Emmons's employee, Joey George, a salary for his work on the Alison for Kentucky campaign.  [R. 274 at 26; R. 29 at 80–82.]  With these facts in evidence, a reasonable jury could certainly find that the payments by S.R. Holding to Mr. Emmons were illegal corporate contributions.  Any "failure" to prove coordination or an intent to influence the election is irrelevant.

**c**

When Mr. Emmons was working in the basement of the Alison for Kentucky campaign building, Mr. Emmons hired Wendell Wilson Consulting to install a wireless network in the building.  [R. 226 at 100–02.]  Mr. Wilson testified that the network was intended to cover the entire building and provide internet-access to multiple people.  The evidence at trial showed that Mr. Emmons invoiced $2,850 to S.R. Holding for an "internet maintenance upgrade."  [R. 252 at 50–51; Gov. Ex. 22A.]  S.R. Holding paid the invoice, and Mr. Emmons paid Wilson for his work.

The defense argues that "even if the Campaign did use the internet services that Wilson set up, the fact that [S.R. Holding] ultimately paid the bill does not make it an illegal corporate contribution."  [R. 310-1 at 17.]  The defense argues that "the Campaign's lease agreement for

the upstairs of that same building provided utilities that were included in the rent," therefore, the Campaign must have paid for internet through its rent payment.  The defendants offer no support for the notion that the internet is a "utility" that would be covered by the rent payment.  Nor do they offer evidence of a network independent from that set up at Mr. Emmons's direction that the Campaign might have ostensibly paid for the ability to use.  The evidence presented is sufficient, and a reasonable jury could find that payment for the installation and maintenance of the internet, by S.R. Holding and through Mr. Emmons, was an illegal corporate contribution to the Grimes campaign.

### d

Defendants next argue that no rational trier of fact could find them guilty of causing an unlawful campaign contribution by paying for robocalls and mailers.  [R. 310-1 at 25–28; R. 323 at 18-20.]  Both defendants assert that 11 C.F.R. § 109.21 governs the dissemination of robocalls and mailers, and that as a matter of law, the robocalls and mailers fail to meet the "content" and "conduct" prongs of § 109.21.  Section 109.21 applies only to communications coordinated between the campaign and an outside group.  11 C.F.R. § 109.21.  The government's theory of the case was that Mr. Lundergan was intimately involved in the campaign as well as dissemination of the robocalls and mailers, such that the robocalls and mailers at issue were really issued by the campaign itself.  [R. 284 at 129, "When there is no outside group, when what is at issue is the campaign itself issuing robocalls or issuing mailings, these provisions are not implicated."]  There was testimony presented at trial to support this theory: campaign manager Jonathan Hurst testified that he viewed Mr. Lundergan as his supervisor and took direction from Mr. Lundergan about the campaign communications.  [R. 260 at 34–35; R. 271 at 134.].

9

According to Mr. Hurst, Mr. Lundergan was deeply involved in negotiating the communications, and acted in that capacity with the campaign's knowledge.  [R. 260 at 28, 32.]

But whether Mr. Lundergan was as intimately involved in the campaign as the government contends is a question for the trier of fact.  For that reason, in its jury instructions, the Court included language from § 109.21 establishing when a communication is coordinated with a candidate, essentially agreeing with the defendants that § 109.21 *could* apply, but only if the jury rejected the government's theory of the facts.  [R. 298 at 26.]  Nevertheless, the Court finds there is evidence in the record such that the jury could find defendants made unlawful campaign contributions by paying for the robocalls and mailers.

Both Mr. Hurst and Compliance Director Erin Tibe testified that Mr. Lundergan had direct involvement in the running of the campaign; Mr. Hurst even testified that Mr. Lundergan was someone he considered a "boss" within the campaign.  [R. 260 at 41; R. 211 at 24.]  The jury was also presented with evidence that Mr. Lundergan was included on emails between Mr. Emmons and Chism Strategies, as well as email evidence that Mr. Lundergan and Mr. Emmons consulted on the content of the robocalls. [R. 223 at 105–106; R. 252 at 97.]  Forensic Accountant Tressa Whittington showed the jury invoices from Emmons & Co. to S.R Holding Co. showing Mr. Emmons paid for robocalls and was reimbursed for them by Mr. Lundergan.  [R. 274 at 43.]  Despite this, the evidence included testimony that the robocalls included the disclaimer "paid for by Alison for Kentucky."  [R. 223 at 138.]  Accordingly, there is enough evidence that a rational trier of fact could find that Mr. Lundergan and Mr. Emmons made unlawful corporate contributions by paying for the robocalls.

The same analysis applies to the mailers.  The government presented evidence that Bluegrass Mailings, which produced the mailers, invoiced Emmons & Co. for their work, which

in turn invoiced and was reimbursed by S.R. Holding Co.  [R. 229 at 13–16; R. 274 at 50–51.]

Even so, the evidence indicated they too included the "paid for by Alison for Kentucky"

disclaimer.  [R. 229 at 63.]  For the same reasons, the Court finds that a rational trier of fact

could find that Mr. Lundergan made unlawful corporate contributions by paying for the mailings.

**e**

The defendants also argue that the government failed to prove the payments from S.R.

Holding to Financial Innovations for merchandise were illegal corporate contributions.  [R. 310-

1 at 21.]  They argue that the payments fail to meet the statutory definition of contribution

"because the Government did not introduce evidence sufficient to sustain a finding beyond a

reasonable doubt that the purchases in question conferred anything of value to the campaign."

*Id.*  Defendants also argue that the purchase of merchandise is not a contribution because "it is

not the law that only natural persons can lawfully buy and sell limitless campaign branded gear

without any reporting obligations."  *Id.* at 29–30.  Finally, defendants argue that Mr. Lundergan

cannot be held criminally liable for attempting to pay an invoice on behalf of the Campaign

which the Campaign had already paid.  *Id.* at 29.

It is unclear where defendants' "conferred anything of value" standard originates.  If they

mean to argue that the Campaign did not order or receive the merchandise, evidence introduced

at trial undermines that theory.  For instance, the jury heard that the S.R. Holding paid for a

variety of merchandise from Financial Innovations bearing the Alison for Kentucky campaign

logo.  [R. 222 at 8–10, 88–92, 99–103.]  Testimony from Michael Coscia of Financial

Innovations established that Ms. Dobson ordered from him on behalf of the Campaign.  *Id.*

Financial Innovations office manager Donna Dubuque testified that although Alison for

Kentucky was the client, she invoiced and was paid by Mr. Lundergan's corporation for the

11

merchandise.  [R. 222 at 99–103.]  Defendants argument that a corporation is free to purchase campaign-branded merchandise for its own use fails, not because it is legally incorrect, but because the trial testimony established that the merchandise was ordered for use by the Campaign at campaign events.  [R. 222 at 10, 79.]  Likewise, the campaign treasurer Corey Stilz testified that the invoices from Financial Innovations for merchandise were the obligation of the Campaign, and at Alison Grimes's direction he attempted to ensure the purchases were included on the Campaign's payable report.  [R. 215 at 125–28; R. 216 at 78.]  Finally, the government introduced emails which showed Mr. Lundergan told Financial Innovations to bill him for the merchandise instead of the Campaign.  [R. 222 at 23–28; Gov. Exh. 59D.]  From these facts, a rational trier of fact could have concluded that S.R. Holding paid for merchandise that was purchased by the campaign.

Defendant's arguments that the attempt to pay an invoice that was previously paid for the campaign also fails.  As the government points out, this attempt belies intent; "the fact that the Alison for Kentucky Campaign paid [the invoice] shows that the 10,000 rally signs were a campaign expense, and that Lundergan *intended* to pay for a campaign expense with S.R. Holding funds[.]"  [R. 320 at 33.]  Finally, as more fully explained *infra* II.A.2.f, the ban on corporate contributions extends to after an election is decided.  Allowing post-election transactions would create a loophole in the corporate contribution ban so large as to render it meaningless.

**f**

Next, defendants contend that the government failed to prove the payments made by S.R. Holding to Axxis and Financial Innovations after the election were illegal campaign contributions.  [R. 310-1 at 22–24.]  According to the defense, these payments are not

contributions as a matter of law because they were not coordinated with the campaign and, because they were not made until *after* the election, cannot be said to have been made for the purpose of influencing the election.

The Court reiterates, again, that coordination is simply not required. Likewise, the government is not required to show that the payments were made for the purpose of influencing the election. With regard to the Axxis payments, defendants argue that the payments were made "to maintain [S.R. Holding's] business relationship with sub-vendor that had been aggressively vocal about not having been paid for work it had done." [R. 310-1 at 32.] The same argument is made with regard to Financial Innovations; defendants insist that the post-election payments were made to "maintain Lundergan's preexisting relationship with Mark Weiner, the then-principal of [Financial Innovations]." [R. 310-1 at 31.] The "why" here is immaterial, because the corporate contribution ban includes "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose," 52 U.S.C. § 30101(8)(A)(ii), as well as providing something of value "in connection with any election[.]" 52 U.S.C. § 30118(b)(2).

Finally, it is well established that permitting candidates to receive unrestricted contributions after the election ended would provide a loophole to campaign finance laws so large as to render them meaningless. The FEC itself has interpreted the statute to also include post-election transactions. *See* Fed. Election Comm'n, Advisory Op. 1983-02 (Feb. 24, 1983), *available at* https://www.fec.gov/files/legal/aos/1983-02/1983-02.pdf; *see also* Fed. Election Comm'n, Advisory Op. 1982-64 (Feb. 10, 1983), *available at* https://www.fec.gov/files/legal/aos/1982-64/1982-64.pdf; Fed. Election Comm'n, Advisory Op. 1981-22 (May 29, 1981), *available at* https://www.fec.gov/files/legal/aos/1981-22/1981-22.pdf.;

*see also FEC v. Ted Haley Cong. Comm.*, 852 F.2d 1111, 1116 (9th Cir. 1988); *FEC v. Lance*, 617 F.2d 365, 372 n. 4 (5th Cir. 1980); *United States v. Smukler*, 330 F. Supp. Ed 1050, 1058 (E.D. Pa. Aug. 1, 2018); *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 357 (D.D.C. Jan. 3, 1997); *United States v. Sun-Diamond Growers of Cal.*, 941 F. Supp. 1277, 1280–81 (D.D.C. Oct. 7, 1996); *United States v. Clifford*, 409 F. Supp. 1070, 1074 (E.D.N.Y. Mar. 3, 1976). Thus, defendants' argument is not the law. The timing of the corporate contribution, in this instance, has no bearing on its legality.

**g**

The government not only had to prove the transactions at issue were corporate contributions to the Alison for Kentucky campaign, but also that the defendants effectuated those contributions "knowingly and willfully." The defendants assert that the evidence presented failed to carry this burden, because "[t]he only reasonable interpretation of the weight of the evidence was that the failure to seek timely reimbursement from the Campaign was [S.R. Holding's Operations Manager Abby Lundergan Dobson's] innocent oversight." [R. 310-1 at 36; R. 323 at 21.] The Court disagrees.

Counsel for the government presented ample evidence by which a reasonable jury could find that Mr. Lundergan and Mr. Emmons knowingly and willingly caused illegal corporate contributions to be made to the Grimes campaign. The Court has already decided that the *mens rea* standard elucidated in *Bryan* applies to this case. [R. 193 at 5.] The *Bryan* standard requires the government prove the defendant knew his conduct was unlawful, but does not require knowledge of the specific statute being violated. *Bryan v. United States*, 524 U.S. 184, 195 (1998). Thus, the United States need only prove that Mr. Lundergan and Mr. Emmons knew that

there existed a ban on corporate contributions to federal campaigns above a certain dollar threshold.  The government presented several pieces of evidence on this point.

For example, Ms. Tibe testified that in February 2014 she gave a presentation that discussed the basics of campaign finance rules.  [R. 211 at 35–38.]  Ms. Tibe also testified that those working on the campaign were provided a handbook.  *Id.*  Through Ms. Tibe, the government introduced an email sent from Ms. Tibe to Mr. Emmons' email account in which she told Mr. Emmons the campaign could not accept donations from corporations.  [R. 211 at 81.]  Though Mr. Emmons responded to that email with "these compliance matters are beyond my expertise and campaign responsibilities," Ms. Tibe testified that she had no reason to believe Mr. Emmons did not understand that corporations could not make contributions to campaigns.  *Id.*  The jury also heard testimony and was presented with email evidence that the Alison for Kentucky campaign was under some media scrutiny for its spending.  [R. 211 at 49.]  Ms. Tibe testified that the campaign regularly received emails from reporters questioning how campaign events had been financed; she stated that the media frequently scrutinized S.R. Holding Co.'s payments and services provided to the campaign.  *Id.*  According to Ms. Tibe, Mr. Lundergan was aware of the scrutiny and the resultant need for the campaign to be extremely careful in reporting its expenses on FEC reports.  *Id.*

Similar testimony came from Mr. Hurst.  Mr. Hurst pointed out that Mr. Emmons and Mr. Lundergan had been involved in Kentucky politics for quite some time.  They were experienced veterans, not wide-eyed newcomers.  Mr. Hurst believed Mr. Lundergan knew the relevant corporate contribution rules based on their past dealings and Lundergan's own "political understanding."  [R. 260 at 85.]  The jury could also have credited Mr. Hurst's testimony that "for us playing at that level, we would have known the campaign finance rules."  [R. 261 at 33.]

Finally, there is the method by which the contributions were effectuated.  Defendant's contend that because the contributions were made through a series of transactions—a vendor would offer some service to the campaign, Mr. Emmons would pay that vendor, and then invoice S.R. Holding for reimbursement—means the issue is not so cut and dry.  Perhaps Mr. Lundergan and Mr. Emmons knew they couldn't cut a check to the campaign, but how were they to know it was wrong to pay vendors?  However, the same facts support the government's theory that Mr. Emmons and Mr. Lundergan were attempting to "paper over" the payments made on behalf of the campaign.  The generic descriptors, such as "consulting services retainer" and "marketing expense," included on invoices and payments could be interpreted as being purposefully vague. [Gov. Ex. 4A, 1A, 20H.]

This is not every piece of evidence presented regarding the defendants' knowledge, or lack thereof, surrounding campaign finance law.  Nevertheless, the Court finds the government introduced sufficient evidence such that a rational trier of fact could find the defendants' had the requisite knowledge, and therefore *mens rea*, to convict under Count Two.

**3**

Defendants argue that no reasonable jury could find Mr. Emmons and Mr. Lundergan caused the Campaign to omit contributions from its campaign finance reports, and therefore Counts Three through Ten must be dismissed. [R. 310-1 at 36-47; R. 323 at 26–36.] Counts Three, Five, Seven and Nine charge violations of 18 U.S.C. § 1001.  Counts Four, Six, Eight and Ten charge violations of 18 U.S.C. § 1519.  Section 1001(a)(2) makes it a crime to knowingly or willfully "make[] any materially false, fictitious, or fraudulent statement or representation" in regard to any matter within the jurisdiction of the executive, legislative of judicial branch of the United States government.  18 U.S.C. § 1001(a)(2).  Similarly, § 1519 criminalizes knowingly

16

tampering with a record or document "with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States[.]"  18 U.S.C. § 1519.  The defendants are charged pursuant to 18 U.S.C.§ 2, which allows prosecution as principal of one who "aids, abets, counsels, commands, induces or procures," or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States[.]"  18 U.S.C. § 2.

The Defendant's joint Rule 29 motion makes three main arguments[1].  First, the defense argues for acquittal on the basis that the campaign was not "unwitting" in failing to include the contributions at issue in its reporting.  Second, they argue the government failed to show Mr. Lundergan and Mr. Emmons acted willfully in securing false reports.  Third and finally, defendants allege that the government did not show §§ 1001 and 1519 were violated because "the reports at issue were filed with the Secretary of the Senate, not the FEC[.]"  [R. 310-1 at 42. In fact, there is ample evidence in the record to support a conviction on Counts Three through Ten.

The crux of defendants' "unwitting" argument is "the Campaign knew about the goods and services related to the charged payments and had sufficient information to know where to direct an inquiry about them[.]" *Id.* at 38.  Because the campaign knew about items paid for by S.R. Holding—for example, the screen, PA system, and teleprompter at the Carrick House kickoff event—it can't be said the campaign was unwitting when it did not include the source of payment for those items on its reports.  Defendants' reasoning misses the mark.  The government does not allege the campaign was unwitting about what goods and services it received, but who

---

[1] Actually, Defendants also argue that §§ 1001 and 1519 were not violated, because the relevant transactions were not "contributions" as defined by FECA.  This is well-covered ground that will not be readdressed here. *See supra* II.A.1.

paid for those goods and services.  The campaign was "unwitting" in that, when it filed its FEC reports, it did not know they were incorrect, because it did not know about the payments made by S.R. Holding which Mr. Lundergan and Mr. Emmons concealed.

Evidence at trial established that, as compliance director, Ms. Tibe became aware of expenses of the campaign through charges made on the campaign credit card, or through invoices that were sent to the campaign.  [R. 211 at 21.]  It logically follows that Ms. Tibe could not have learned of the invoices received and paid by Mr. Emmons or Mr. Lundergan in this manner.  Based on this evidence, a rational trier of fact could conclude the campaign—or more specifically, those in charge of compliance within the campaign—were unaware of the invoices that were paid by Mr. Emmons and Emmons & Co., because the invoices were not delivered to the campaign itself.  Accordingly, a rational trier of fact could conclude the campaign "unwittingly" filed false reports with the FEC.

Defendants' next argument is that the government failed to prove the defendants had the requisite *mens rea*.  According to the defendants, the government was required to prove "that Defendants knew that each of the reports omitted each of the charged payments and knew that omitting their omission [sic] was illegal," with respect to the § 1001 counts, and that "Defendants intended to impede, obstruct, or influence the investigation of these payments," with respect to the § 1519 counts.  [R. 310-1 at 49.]  Defendants' willfulness in making the illegal payments has been addressed above.  Further, the testimony presented at trial established that the defendants knew the campaign was obligated to report any contributions made by corporations to the FEC.  [*See* R. 215 at 116–17; R. 211 at 47–49; R. 260 at 17, 55, 63–64.] This, plus evidence indicating Mr. Lundergan and Mr. Emmons purposefully concealed payments

from the campaign, is enough to find that they willfully caused the campaign to file false reports which were intended to impede proper investigation into the payments.

Third and finally, the defendants' jurisdictional argument also fails.  Defendants believe that because the FEC reports were filed with Secretary of State as the "custodian of records" for the FEC—as opposed to the FEC directly—the reports are a "matter within the jurisdiction of the legislative branch[.]"  [R. 310-1 at 45–47; 18 U.S.C. § 1001(a),(c).]  Therefore, the government must prove that the reports are related to an administrative matter or an investigation within the purview of Congress.  18 U.S.C. § 1001(c).  The FEC is an executive agency, and so the defendants want Counts Three, Five, Seven and Nine dismissed on the grounds that §1001 inapplicable to the facts of the case.  Their argument with respect to § 1519 is similar.  Section 1519 pertains to matters within the executive branch of the United States government.  18 U.S.C § 1519.  Because the reports are initially given to the Secretary of Senate—part of the legislative branch—defendants argue § 1519 does not apply.

Summed up, their argument that the reports were filed with the Secretary of the Senate as opposed to the FEC latches onto a distinction without a difference.  Prior to 2018, § 30102(g) required relevant "designations, statements, and reports" to be filed with the Secretary of the Senate as custodian for the Federal Election Commission.  52 U.S.C. § 30102(g)(1) (2004).  The Secretary of the Senate was obligated to forward a copy of all filings to the Commission within two business days.  52 U.SC. § 30102(g)(2) ("The Secretary of the Senate *shall forward* a copy of any designation, statement, or report filed with the secretary under this subsection to the Commission as soon as possible (but not later than 2 working days)[.]").  The fact that the Secretary of the Senate accepted the FEC reports at issue as a go-between is of no moment.  All involved knew their final destination was the FEC.  All understood that the FEC would review

and publish the reports.  And the moment the Secretary of the Senate handed off the reports, they became "filed" with the FEC.  [R. 215 at 130–31, 136–37; R. 211at 293–94; R. 215 at 6, 73; R. 252 at 52–60; Gov. Exs. 75B, 75C, 75D, 75E (copies of Alison for Kentucky FEC reports bearing certification that the document is "on file" with he FEC).]

## 4

Finally, the defendants argue that there is insufficient evidence to convict them of the charge of conspiracy detailed in Count One of the Indictment.  They argue "[b]ecuase the charged conduct did not violate federal law, there could not have been an agreement to commit an offense against the United States."  [R. 310-1 at 51.]  They further argue "the same deficiencies in proof related to *mens rea* for Counts Two through Ten also undermine the proof that defendants knowingly and intentionally entered into a conspiracy."  *Id.*  Finally, they argue the government failed to prove the defendants had the requisite intent to violate the corporate contributions ban.  *Id.*

Each of these points have been adequately addressed in the forgoing.  For the reasons already stated, there is ample evidence for a reasonable jury to conclude that the defendants are guilty of the crime of conspiracy.  The joint Rule 29 motion is DENIED.

## B

The defendants alternatively request a new trial pursuant to Federal Rule of Criminal Procedure 33.  Rule 33 allows the Court to vacate a judgment entered against a defendant and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 motions are granted "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict."  *See United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citation omitted).  While the Court construes all evidence in the light most favorable to the government

20

when analyzing a Rule 29 motion, the Court is allowed to "act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence" when resolving a Rule 33 motion. *Id.*; *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Although Rule 33 allows the Court to vacate a jury's verdict and grant a new trial "if the interest of justice so requires," that phrase is not defined in the Federal Rules of Criminal Procedure or elsewhere in the law. *See United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Nevertheless, the Sixth Circuit has articulated "several recurring themes" that emerge from the body of Rule 33 case law that help guide the Court in reaching its conclusion. Rule 33 may be used to grant a new trial if the jury's verdict is against the manifest weight of the evidence, or if a substantial legal error has occurred. *Id.* "[L]ess clear is whether a district court may grant Rule 33 relief where the verdict is not against the substantial weight of the evidence, and where no reversible error or violation of the defendant's substantial rights has occurred, but where the district court nonetheless believes that 'the interest of justice' requires a new trial." *Id.* at 374. For the following reasons, the Court finds that none of defendants' arguments merit a new trial, and the Rule 33 motion is DENIED.

## 1

Regarding the weight of the evidence itself, the defense states only "[a]fter an almost five-week trial involving a statutory scheme that has confounded even Supreme Court justices . . . Defendants deserve more than the two hours the jury took to consider their case." [R. 310-1 at 52; R. 323 at 21.] Defendants have not pointed to, and the Court cannot find, any precedent establishing that a new trial should be granted when a jury is too quick to reach a verdict.

**2**

Defendants next argue that a new trial is warranted in light of the flawed jury instructions in this case.  According to the defendants, the jury instructions were flawed in three ways: (1) "the instructions failed to distinguish between conduct that qualifies as a 'contribution' and conduct that is a mere 'expenditure'"; (2) they fail to "instruct the jury that payment for "communications' only qualify as a 'contribution' if they satisfy[y] the FEC's three-part test for 'coordinated communications' under 11 C.F.R. § 109.21"; and (3) it was error to instruct the jury "that a 'contribution' includes *any* "payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  [R. 310-1 at 53, 56, 57.]

To begin, the issue of what is a "contribution" and what is not has been addressed over and over again by this Court.  The analysis previously set out, *supra* II.A.1, is equally applicable here.  The instructions were clear; this Court defined "contribution" for the jury, despite the defendants' persistent attempts to muddy the waters.  The Defendant's second argument has likewise been previously addressed herein.  The communications instruction, which relates to the mailers and robocalls, was correct.  Defendants' argument, while logical, rests on a faulty presumption. That is, that Mr. Lundergan is not part of "an authorized committee, a political party committee, or an agent of any of the foregoing."  11 C.F.R § 109.21.  The government's theory is that Mr. Lundergan held a position in the campaign in which he oversaw marketing and communications.  The complained-of instruction stated the law when the communication comes from the campaign (or its agent) directly. Thus, this argument fails.

Third and finally, the Court is again unpersuaded by defendants' argument that contributions do not include payment for the services of another.  For support, the defense cites

the same handful of enforcement decisions and advisory opinions as it has throughout litigation. MUR 5937 (Romney for President Inc.); MUR 6940 (Correct the Record); Adv. Op. 2015-14 (Hillary for America II).  When read in their entirety these are easily distinguishable from the facts at hand.  The Court would bow to these "authoritative decisions of the FEC to which the Court must give deference," if they had any applicability at all. [R. 310-1 at 54, n. 13.] Respectfully, they do not.

**3**

Defendants' final argument is that certain evidentiary rulings were in error, and prejudicial enough to the defense to warrant a new trial.  [R. 310-1 at 59; R. 323 at 5.] Defendants cite two specific rulings.  The first is the Court's decision to allow admission of 404(b) evidence related to Alison Lundergan Grimes's 2011 and 2015 Secretary of State races. The defense argues that this evidence "offered nothing of legitimate value" to the question of guilt, and was highly prejudicial to the defendants.  They point specifically to testimony and photo evidence that Mr. Lundergan left blank checks and cash in Mr. Hurst's apartment, allegedly for Mr. Hurst to procure future mailers for the 2015 campaign.

Generally, the Government may not introduce evidence of other bad acts at trial because the introduction of such evidence may lead to an improper guilty verdict.  Fed. R. Evid. 404.  In some limited circumstances, however, the Government may introduce evidence of past conduct if the conduct is sufficiently tied to the presently charged offense.  To determine whether evidence of another bad act is admissible, the Court must determine if sufficient evidence exists that the act in question occurred, whether the evidence of that act is probative of a material issue other than the defendant's character, and whether the probative value of that evidence is

substantially outweighed by its potential prejudicial effect. *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003).

At trial, the Government sought introduction of evidence related to the 2011 and 2015 Kentucky state elections as demonstrative of lack of mistake on the part of Mr. Lundergan. Mr. Lundergan consistently argued at trial that he was ignorant of the applicable federal campaign finance laws, and therefore lacked the requisite intent to violate them. The Government contended evidence that Mr. Lundergan had surreptitiously funneled money into other campaigns, even though they concerned state elections, was evidence that the indicted conduct was not a simple mistake. The Defense objected to admission of the evidence. Mr. Lundergan argued the conduct from 2011 was not illegal when it occurred, and that only subsequently did Kentucky prohibit campaign funding of that type. [R. 161 at 7–8.] He further argues that the 2015 conduct is inadmissible because it occurred after the indicted conduct.

The Court had occasion to consider these arguments before the Government sought admission of this evidence at trial. This specific 404(b) evidence was subject of a Motion in Limine [R. 84], a Motion to Suppress [R. 85], and after voire dire, a Supplemental Motion to Exclude [R. 194]. The Court denied these motions by written orders. [R. 178; R. 207.] Consistent with its written Orders, the Court admitted the evidence at trial, finding that it demonstrated lack of mistake on the part of Mr. Lundergan, and that any prejudice did not substantially outweigh its probative value. "It is not necessary . . . that the crimes be identical in every detail" in order to be admissible under Rule 404(b). *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (citing *United States v. Hamilton*, 684 F.2d 380, 385 (6th Cir. 1980)). Of course, a certain degree of prejudice is presumed to occur when "other acts" evidence is introduced, even if for a legitimate purpose. But prejudice only precludes admission where "the

24

likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered; to suggest that the defendant is a bad person . . . and that if he 'did it before he probably did it again,'" and the risk of this prejudice *substantially outweighs* its probative value. *United States v. Bell,* 516 F.3d 432, 444 (6th Cir. 2008) (quoting *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994)).

Here, the Court found the evidence was sufficiently similar to the charged crime, and that its probative value was not substantially outweighed by its prejudicial effect. Evidence of state law violations is probative of the charged federal violations because it demonstrates lack of mistake. Mr. Lundergan may not claim ignorance as a defense; he knew what he was doing, because he had surreptitiously funneled money into his daughter's political campaigns on other occasions. Further, the timing of the evidence does not vitiate its probative value. Mr. Lundergan argues that although prior to 2016 Kentucky prohibited corporations from using money or things of value to influence elections, subsequently the practice was legalized. This fact does not render the evidence inadmissible. Even if the conduct at issue became protected in 2016, it was illegal in 2011 and 2015 when Mr. Lundergan engaged in it, and is therefore still probative of lack of mistake.

Finally, although Rule 404(b) is commonly referred to as the "prior bad acts" rule, the rule itself does not include the limitation that the acts be prior. Per Rule 404, "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Mr. Lundergan argue the 2015 conduct is not probative of absence of mistake concerning the indicted conduct, because it occurred afterwards. But under the rule, evidence of subsequent acts is admissible as well, so long as the evidence meets the requirements of Rule 404(b)(2). *See*

*United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006). Nothing in the language of the rule limits application only to conduct occurring prior to the indicted conduct.

Even if admission of the cash and checks in Hurst's home was error, it was harmless error. "An error is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Booker*, 24 Fed. App'x 268, 272 (6th Cir. 2001) (citing *United States v. Rogers*, 118 F.3d 466, 478–79 (6th Cir. 1997)). In the instant case, the Court finds that there was ample evidence to convict the defendants even without admission of this evidence.

Defendant's also cite to the Court's decision to exclude Defense Exhibit 680. This exhibit was an email exchange between Agent Hanna and Forensic Accountant Tressa Whittington, in which Agent Hanna told Ms. Whittington they needed additional evidence to "push DOJ over the hurdle to indict." [R. 310-1 at 62.] The defense argues this email was key in that it showed a lack of integrity in the investigation. Somehow, defendants have reasoned that because *at one time* Agent Hanna felt more evidence was needed before the DOJ would indict the defendants, that there was insufficient evidence at the time of indictment. Thus it follows, they assume, that the "FBI pursued an indictment despite there being a lack of evidence[.]" *Id.* at 63.

The record does not support this conclusion. At best, this email gives a glimpse into the timeline of the investigation. If shown this email, the jury could have concluded that the investigation into Mr. Lundergan and Mr. Emmons was ongoing until shortly before the grand jury issued its indictment. And so what? It says nothing about how the evidence did (or, to give the defendants the benefit of the doubt) didn't develop in the time between sending the email and the indictment. It had no probative value, and could easily have confused the jury. Fed. R. Evid. 403. Its exclusion does not warrant a new trial. Defendants' Rule 33 motion is DENIED.

### III

In addressing the defendants' Joined Renewed Motion for Judgement of Acquittal, the Court has said nothing new.  Defendants' arguments about the correct legal definition of a contribution, the requirement of coordination, and when and whether a contribution or expenditure needs to be made "for the purpose of influencing the election," to state a few, have been addressed and readdressed on several occasions by this Court.  At the close of its proof, the government had presented enough elements to satisfy what this Court finds the law requires.  Accordingly, the motion for a judgment of acquittal [R. 310] is DENIED.  The same is true for the motion for a new trial.  The jury instructions and evidentiary rulings complained of do not warrant a new trial.  Thus, the defendants' joint motion for a new trial [R. 310] is also **DENIED**.

This the 10th day of July, 2020.

Gregory F. Van Tatenhove
United States District Judge